IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

BILLY GARRETT,            )
                                )
        Plaintiff,       )
                                )
  v.                     )  Case No. 05-00530-CV-W-REL-SSA
                                )
JO ANNE B. BARNHART, Commissioner  )
of Social Security,         )
                              )
        Defendant.    )

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Billy Garrett seeks review of the final decision of the Commissioner of Social Security denying his application for disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401, et seq., and for supplemental security income benefits under Title XVI of the Act, 42 U.S.C. §§ 1381, et seq. Plaintiff argues that the Administrative Law Judge ("ALJ") erred in: (1) discrediting his subjective complaints regarding his mental and physical impairments; (2) finding that his impairments did not meet or equal the requirements of Listings 12.02, 12.04B or 12.05C; and (3) relying on the vocational expert's testimony that he could perform past relevant work. I find that the ALJ properly (1) determined Plaintiff's subjective complaints of pain were not credible, (2) found that his impairments did not meet or equal the requirements of Listings 12.02, 12.04B or 12.05C, and (3) relied on the testimony of the vocational expert. Therefore, Plaintiff's Motion for Summary Judgment will be denied and the decision of the Commissioner will be affirmed.

## I. BACKGROUND

Plaintiff submitted a claim for both Social Security Disability Insurance Benefits and

Supplemental Security Income Benefits on February 5, 2002, alleging that he had been disabled since May 20, 2001. Plaintiff's alleged disability and inability to work stems from physical and mental impairments including high blood pressure and cholesterol, back and hip problems, vision and hearing problems, breathing problems, obesity, depression, personality disorder, and problems with reading and understanding. Plaintiff's application was denied initially and upon reconsideration. On November 19, 2003, a hearing was held before an ALJ. On December 23, 2003, the ALJ found that Plaintiff was not under a "disability" as defined in the Act. On April 9, 2005, the Appeals Council denied Plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

In addition to appealing the decision of the ALJ, Plaintiff also filed a second application for disability benefits on June 29, 2004 (Tr. at 5-6). He was subsequently found to be disabled as of December 24, 2003 (Tr. at 5-6). As a result, the narrow issue before this court is Plaintiff's disability status from May 20, 2001, through December 23, 2003, the date of the ALJ's decision.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner under Title II. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). This same standard also applies to Title XVI, as the "final determination of the Commissioner of Social Security after a hearing . . . shall be subject to judicial review as provided in section 405(g)." 42 U.S.C. § 1383(c)(3). The determination of whether the Commissioner's decision is supported by substantial

2

evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Heckler, 811 F.2d 1195, 1199 (8th Cir. 1987) (citing Steadman v. Sec. & Exch. Comm'n, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n.5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

### III.  BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted, or can be expected to last, for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A) (governing disability insurance benefits); 42 U.S.C. § 1382c(a)(3)(A) (governing supplemental security income benefits). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. See Wilcutts v. Apfel, 143 F.3d 1134, 1137 (8th Cir. 1998)

3

(discussing burden in supplemental security income benefits case); see also Griffon v. Bowen, 856 F.2d 1150, 1153-54 (8th Cir. 1988)(discussing burden in disability insurance benefits case); McMillian v. Schweiker, 697 F.2d 215, 220-21 (8th Cir. 1983)(discussing burden in disability insurance benefits case).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. §§ 404.1520(c) and 416.920(c) and can be summarized as follows:

1.  Is the claimant performing substantial gainful activity?
    Yes = not disabled.
    No = go to next step.

2.  Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

    No = not disabled.
    Yes = go to next step.

3.  Does the impairment meet or equal a listed impairment in Appendix 1?

    Yes = disabled.
    No = go to next step.

4.  Does the impairment prevent the claimant from doing past relevant work?

    No = not disabled.
    Yes = go to next step where burden shifts to Commissioner.

5.  Does the impairment prevent the claimant from doing any other work?

    Yes = disabled.
    No = not disabled.

4

## IV. THE RECORD

The record consists of the testimony of Plaintiff, Plaintiff's wife Patricia Garrett, and vocational expert Michael Lala, in addition to documentary evidence admitted at the hearing.

### A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

Plaintiff's earnings record indicates that he eared the following income from 1967 through 2001:

| Year | Amount | Year | Amount |
|------|--------|------|--------|
| 1967 | $ 111.45 | 1985 | $ 892.00 |
| 1968 | 1,742.99 | 1986 | 0.00 |
| 1969 | 140.47 | 1987 | 2,100.51 |
| 1970 | 687.90 | 1988 | 8,483.83 |
| 1971 | 1,974.55 | 1989 | 9,508.21 |
| 1972 | 1,305.24 | 1990 | 10,359.80 |
| 1973 | 3,160.70 | 1991 | 12,243.39 |
| 1974 | 2,724.38 | 1992 | 13,077.34 |
| 1975 | 3,206.25 | 1993 | 12,719.99 |
| 1976 | 1,525.78 | 1994 | 13,864.35 |
| 1977 | 956.31 | 1995 | 5,790.82 |
| 1978 | 2,339.28 | 1996 | 3,595.56 |
| 1979 | 4,354.16 | 1997 | 6,680.66 |
| 1980 | 3,119.22 | 1998 | 12,572.52 |
| 1981 | 1,431.88 | 1999 | 14,486.91 |
| 1982 | 0.00 | 2000 | 15,554.71 |
| 1983 | 0.00 | 2001 | 6,922.25 |
| 1984 | 0.00 | | |

(Tr. at 68, 71).

### Claimant Questionnaire

In his Claimant Questionnaire, Plaintiff indicated that his pain never goes away (Tr. at 94). He stated that pain has caused him to become depressed because he can no longer do

anything on his own (Tr. at 94). Plaintiff's wife puts on his socks and shoes and waits on him "a lot" (Tr. at 94). He is able to put on his own pants using a bent hanger (Tr. at 95).

Plaintiff stated his pain prohibits him from doing the work he used to do (Tr. at 95). His inability to walk as needed also prevents him from going hunting and fishing or playing sports as often as he would like (Tr. at 95, 96). He does not prepare meals or perform any other household chores (Tr. at 95). Plaintiff is barely able to read and does not understand the material he is able to read (Tr. at 95). He attended special education classes until the 11th grade, and stated he was given passing grades "for being there" (Tr. at 95). Plaintiff does very little shopping because he is unable to see the prices on the various items and cannot afford to go to the eye doctor (Tr. at 95). Similarly, Plaintiff has trouble using the phone due to his inability to see the numbers (Tr. at 97). He also reported difficulty hearing the television and radio unless the volume is loud (Tr. at 96).

Plaintiff leaves his home one to two times a week (Tr. at 96). He has a driver's licence, but has difficulty seeing at night (Tr. at 96). It takes Plaintiff "awhile" to get into the car and sitting in the seat for long periods of time is hard (Tr. at 96). Most trips are either to the local store, or to his doctor's office, which is approximately twelve miles away; these excursions each last about one hour (Tr. at 96).

Although he has received treatment for his depression, Plaintiff stated that it "seemed to make it worse so I stay depress [sic] a lot" (Tr. at 94). He loses his patience with his wife and family and is easily upset (Tr. at 97). Plaintiff reported taking the following medications: (1)

6

Atenolol,[1] 25 mg, one time per day; (2) Arthrotec,[2] 75 mg, two times per day; (3)

Cyclobenzaprine,[3] 10 mg, one every eight to ten hours for three days; (4) Vioxx,[4] 25 mg, 2 times

per day; and (5) Prednisone,[5] 5 mg, 4 pills two times a day for three days, 3 pills two times a day

for three days, 2 pills two times per day for two days, and then 1 pill two times per day until

finished (Tr. at 94).  Self-reported side effects of his medications include a loss of sex drive and

difficulty sleeping (Tr. at 94, 95).

### Office of Hearings and Appeals Questionnaire

In response to a questionnaire provided by the Office of Hearings and Appeals, Plaintiff

listed his limitations as follows: (1) inability to stand for more than thirty minutes, as standing

bothered his back and legs; (2) inability to walk more than one block before his legs began to

hurt; (3) inability to lift or carry more than approximately ten pounds; (4) inability to sit for more

than thirty minutes, as it bothered his back and legs; and (5) inability to correctly move his right

---

[1]Atenolol is "used to lower blood pressure, lower heart rate, reduce chest pain (angina), and to reduce the risk of recurrent heart attacks."  Yahoo!Health, Drug Guide, at http://health.yahoo.com/ drug/d00004a1;_ylt=AkoJfs9K_AdXl7g0MwIvzOkkD7sF (last visited May 2, 2006).

[2]Arthrotec is a nonsteroidal anti-inflammatory drug that "works by reducing substances that cause inflammation and pain in the body."  Yahoo!Health, Drug Guide, at http://health.yahoo.com/drug/ d04271a1;_ylt=AoJ0aGvbPlHYgoJdlGZaj2IkD7sF (last visited May 2, 2006).

[3]Cyclobenzaprine is a muscle relaxant that "works by blocking nerve impulses (or pain sensations) that are sent to [the] brain."  It is used, along with rest and physical therapy, for short-term treatment in relieving "pain, tenderness, and limitation of motion caused by muscle spasms."  Yahoo!Health, Drug Guide, at http://health.yahoo.com/drug/d00963a1;_ylt= AndCf01inOEQPOL6QjASlEUkD7sF (last visited May 2, 2006).

[4]Vioxx is a nonsteroidal anti-inflammatory drugs that "works by reducing substances that cause inflammation, pain, and fever in the body."  Yahoo!Health, Drug Guide, at http://health.yahoo.com/drug/ d04433a1;_ylt=AnrxVXfRHLB7SF2ns6rddTEkD7sF (last visited May 2, 2006).

[5]Prednisone is a steroid that "reduces swelling and decreases the body's ability to fight infections."  Yahoo!Health, Drug Guide, at http://health.yahoo.com/drug/ d00350a1;_ylt= AmvIHCPNZ2AKPUtiadX5JiwkD7sF (last visited May 2, 2006).

elbow and fingers (Tr. at 116). He reported being unable to mow the grass, and mop and/or vacuum the floors; he could not shop for groceries because he would "forg[e]t what he needed to get" (Tr. at 116). Plaintiff reported that he does not drive often and can only do so for short distances (Tr. at 117). During an ordinary day, Plaintiff stays at home, alternating between periods of sitting, standing, and lying down (Tr. at 117).

### B. SUMMARY OF MEDICAL RECORDS

On July 15, 1996, Plaintiff was seen at Truman Lake Center (Tr. at 133). He felt pretty good but was requesting blood pressure medication (Tr. at 133). He was diagnosed with depression and given a prescription for Paxil (Tr. at 133). Medications were refilled on two occasions in August of 1996 (Tr. at 132).

On April 23, 1998, Plaintiff was diagnosed with right lobe pneumonia and lower left lobe infiltrates (Tr. at 131). Chest x-rays were negative (Tr. at 144). Plaintiff was treated for an itchy rash on both feet on August 7,1998 (Tr. at 130). He was diagnosed with bronchitis on September 1, 1998, but had negative chest x-rays (Tr. at 129, 143).

From 1999 through 2000, doctors monitored Plaintiff's hypertension and hyperlipidemia (Tr. at 124-128, 139, 141-142). On October 13, 1999, Plaintiff reported feeling "good," had more energy, and did not report any new problems (Tr. at 126). Plaintiff's February 7, 2000, laboratory results showed that he had high cholesterol and was prescribed Lipitor[6] 40 mg (Tr. at 136). He was prescribed Baycol[7] and Atenolol on February 22, 2000 (Tr. at 124). Laboratory

---

[6]Lipitor is used to reduce cholesterol levels. Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d04105a1;_ylt=Ahh3h7h2394AT62UWLMR1KEkD7sF (last visited May 5, 2006).

[7]Baycol "blocks the production of cholesterol . . . in the body." Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d04140a1;_ylt=AiIyHtvtmNIwLXpOu6naYsAkD7sF (last visited May 5, 2006).

results from April 3, 2000, revealed high cholesterol; Plaintiff was again prescribed Lipitor 40

mg (Tr. at 134,135).

Plaintiff saw Dr. Badger on January 6, 2001, with complaints of depression (Tr. at 123).

He was given a prescription for 20 mg of Celexa[8] to treat his depression and 40 mg of Lescol[9] for

hyperlipidemia; Plaintiff was also instructed to continue taking 25 mg of Tenormin[10] (Tr. at 123).

On April 17, 2001, Plaintiff reported that the Celexa helped him sleep and lessened his

depression (Tr. at 122). He stated that he was happy with the results, and wanted to continue

taking the drug (Tr. at 122). Dr. Badger diagnosed Plaintiff with hypertension and depression,

and directed him to continue his medications and return in three months (Tr. at 122).

On June 4, 2001, Plaintiff saw Wayne Morton, M.D., at the Morton/Van Zanten Clinic as

a follow-up for his pneumonia (Tr. at 150). By June 11, 2001, the pneumonia had resolved (Tr.

at 150). Dr. Morton's assessment included hypertension and depression (Tr. at 150).

On September 18, 2001, Plaintiff had his blood pressure checked and was given a

prescription for Tenormin 50 mg (Tr. at 149). He was again diagnosed as having depression and

reported the Celexa was helping (Tr. at 149). On September 19, 2001, he received a prescription

for Zocor[11] 20 mg (Tr. at 149). Plaintiff was prescribed Tenormin 50 mg, ½ tablet for thirty days

---

[8]Celexa is used to treat depression. Yahoo!Health, Drug Guide, at
http://health.yahoo.com/drug/d04332a1;_ylt=AqKE1.p2hdk7P41ApVFKAGYkD7sF (last visited May 5, 2006).

[9]Lescol "blocks the production of cholesterol . . . in the body." Yahoo!Health, Drug Guide, at
http://health.yahoo.com/drug/d03183a1;_ylt=AvLJ9Gkq.g_yemOjXaeCBuYkD7sF (last visited May 5, 2006).

[10]Tenormin is the brand name for Atenolol, see supra note 1.

[11]Zocor "blocks the production of cholesterol . . . in the body." Yahoo!Health, Drug Guide, at
http://health.yahoo.com/drug/d00746a1;_ylt=At0O7o215X1V7eUfV1zXJ8IkD7sF (last visited May 5, 2006).

9

on both November 19, 2001, and January 22, 2002 (Tr. at 149).

Plaintiff saw Dr. Morton on February 20, 2002, for back pain (Tr. at 149). He stated that he had suffered from chronic back trouble for the past fifteen years due to a fall in the bathtub and a fall on the ice (Tr. at 149). Plaintiff had been treated by a chiropractor and was also evaluated by an orthopedic doctor, who opined the injury was not bad enough to prevent Plaintiff from working (Tr. at 149). On examination, Dr. Morton found positive straight leg raises on the left at ten degrees, pain in the right posterior lumbar/sacroiliac joint area, and positive deep tendon reflexes (Tr. at 148-149). Plaintiff reported difficulty standing, sitting, and getting up and down (Tr. at 148-149). When walking, he staggered and grasped his right lumbar area (Tr. at 148). Plaintiff also reported he had pain lying down, as a result of lifting a battery out of a car two years ago (Tr. at 148). Pain from his back occasionally traveled to his right knee (Tr. at 148). Dr. Morton diagnosed Plaintiff as having back pain with spasms (Tr. at 148). Lumbar spine x-rays were ordered and Plaintiff was prescribed Arthrotec 75 mg, to be taken twice a day, and Flexeril[12] 10 mg for the muscle spasms (Tr. at 148).

On February 27, 2002, Plaintiff was much improved (Tr. at 148). Straight leg raises were at 45 degrees bilaterally (Tr. at 148). Plaintiff walked without difficulty, and did not have any numbness, tingling or pedal edema[13] (Tr. at 148). Assessment was back pain with spasms (Tr. at 148). Plaintiff's Flexeril prescription was continued and his dosage of Arthrotec was reduced to 50 mg (Tr. at 148).

---

[12]Flexeril is the brand name for Cyclobenzaprine, see supra note 3.

[13]Pedal edema is "[a]n accumulation of an excessive amount of watery fluid in cells, tissues, or serous cavities," or swelling of the feet. STEDMAN'S MEDICAL DICTIONARY 544, 1316 (26th ed. 1995).

10

On March 8, 2002, Plaintiff saw Dr. Morton, complaining that his leg hurt and that the Arthrotec was not helping (Tr. at 147). Physical examination revealed Plaintiff had a burning sensation in his right posterior thigh from his lower right lumbar spine; he also had back pain with spasms (Tr. at 147). Straight leg raises were positive on the right (Tr. at 147). Dr. Morton (1) prescribed 25 mg Vioxx twice daily, for two days, (2) ordered a refill for Flexeril, and (3) told Plaintiff to apply warm moist packs for twenty minutes, two to three times per day (Tr. at 147).

During his March 19, 2002, office visit, Plaintiff advised Dr. Morton his right leg was still painful with no help from the medications (Tr. at 147). He had positive straight leg raises on the right and a continued burning sensation in his right posterior thigh that radiated from his right lower lumbar area (Tr. at 147). The pain eased after Plaintiff went to bed (Tr. at 147). Dr. Morton noted he walked without difficulty (Tr. at 147). Plaintiff's assessment was back pain with spasms, and he was prescribed a course of Prednisone; his Flexeril prescription was continued (Tr. at 147).

On March 28, 2002, Plaintiff reported improvement and stated he could now stand, sit and bend down for short periods of time (Tr. at 187). The pain continued into his legs, but it was not as sharp (Tr. at 187). He also had numbness in his right leg (Tr. at 187). Dr. Morton assessed Plaintiff as having back pain with spasms. Plaintiff was given samples of Celebrex and directed to continue taking Flexeril (Tr. at 187).

On April 26, 2002, Charles J. Ash, M.D., evaluated Plaintiff at the request of the disability determination agency (Tr. at 153-156). Plaintiff reported a fifteen-year history of pain in his right buttock, that radiated into his right ankle, and was aggravated by bending and lifting (Tr. at 153). He also reported coldness in his right foot and numbness in his right hand when

11

driving (Tr. at 153). Plaintiff's medications included Celebrex, Flexeril, Tenormin and Celexa (Tr. at 153).

Plaintiff was observed to stand erect, move satisfactorily without a limp or list, walk on his toes and heels satisfactorily, and squat fifty percent normally (Tr. at 153). He did not have any difficulty either arising from the exam table and chair, or in dressing and undressing (Tr. at 153). Physical examination revealed some limitation of normal motion in the cervical spine, but no tenderness, muscle spasm, or deformity (Tr. at 153). There was also slight tenderness in Plaintiff's lumbosacral region and tenderness in his right buttock and sciatic notch (Tr. at 154). Plaintiff had a limited range of motion (Tr. at 154).

By contrast, Dr. Ash found Plaintiff had a normal range of motion in his arms (Tr. at 154). Plaintiff did not exhibit any weakness, deformity or atrophy; grip and pinch strength were strong in both hands (Tr. at 154). Straight leg raises were thirty degrees on the right and forty-five degrees on the left (Tr. at 154). There was a large area of chronic dermatitis on Plaintiff's right heel that resembled psoriasis (Tr. at 154). Plaintiff had normal motion of the hips, knees and ankles, with no weakness, deformity or atrophy (Tr. at 154). He had decreased sensation in his right calf that did not definitely follow the dermatome distribution (Tr. at 154).

Dr. Ash diagnosed Plaintiff with probable degenerative disc disease with right sciatica and possible sensory deficit (Tr. at 154). He opined that Plaintiff should refrain from strenuous lifting and bending, but could lift twenty pounds occasionally and ten pounds frequently (Tr. at 154).

Plaintiff's vision was 20/30 in his left eye and 20/40 in his right eye (Tr. at 156). He could hear and understand normal conversational speech with some effort (Tr. at 156). Dr. Ash

noted that Plaintiff's gait, both with and without assistive devices, was fine (Tr. at 156).

Dr. Ash also completed a Mental Status evaluation, in which Plaintiff was asked to perform certain tasks (Tr. at 155). Plaintiff could not recall the street on which he was currently located (Tr. at 155). He was unable to count backward from 100 by serial sevens and could not recite groups of numbers backward (Tr. at 155). When told the statement, "People who live in glass houses should not throw stones," Plaintiff had no idea how to respond (Tr. at 155). He stated that the phrase, "A bird in the hand is worth two in the bush," rhymed (Tr. at 155). Plaintiff correctly stated that if he were in a crowded theater and noticed a fire, he would "get out" (Tr. at 155). However, he stated he had "no idea" what he would do if he found an envelope that had been stamped and addressed lying on the ground (Tr. at 155). Based on his respective responses, Dr. Ash found Plaintiff to have (1) moderately poor insight, (2) severe poverty of content in thought, and be (3) mildly below normal (Plaintiff's Exh. A). He stated Plaintiff had "severe difficulty concentrating," and diagnosed him with anxiety (Plaintiff's Exh. A).

Plaintiff underwent another psychological evaluation with A. Michael Salinger, MA, a licensed psychologist, on April 30, 2002, at the request of St. Clair Family Services (Tr. at 170-173). Mr. Salinger's evaluation procedure included taking an adult social history, a brief clinical interview, and administering the Wechsler Adult Intelligence Scale III, the Kaufman Functional Academic Skills Test, the Minnesota Multiphasic Personality Inventory-2, the Miller Forensic Assessment of Symptoms Test and the Symptom Checklist-90 Revised. During the evaluation Mr. Salinger noted Plaintiff seemed confused at times, had trouble concentrating and had slurred speech (Tr. at 170).

Plaintiff reported that he had completed the 10th grade (Tr. at 170). He explained that he

Case 4:05-cv-00530-REL   Document 20   Filed 06/16/06   Page 13 of 47

was suspended for quarreling with the principal and never returned (Tr. at 170). Although he did

not pursue a GED, he did receive automotive training at a vocational technical school (Tr. at

170). He has not sure where and when he worked prior to 1989, other than knowing he worked

as a handyman and in garden nurseries (Tr. at 171). Plaintiff worked as an automotive machinist

from 1989 until he was laid off in 1996, but found the work very difficult (Tr. at 171). Between

1996 and 2001, he worked at The Rival Company ("Rival") but ultimately quit so that he could

move to Osceola, Missouri (Tr. at 171). He has been unable to find work since that time,

indicating no one wants to hire a 52-year-old man with a bad back (Tr. at 171).

Plaintiff reported sustaining a closed head injury with unconsciousness twelve years ago

when a tire jack hit his head (Tr. at 171). Eight years ago he slipped in a bathtub and dislocated

his hip; he has been treated for a "bad back" since that time (Tr. at 171). He complained of

persistent chest pain, difficulty breathing, and confusion (Tr. at 171). Plaintiff endorsed all

symptoms of a major depression, but did not report or present with any symptoms of delusion or

hallucination (Tr. at 171).

The WAIS III found Plaintiff to have a verbal IQ score of 72, a Performance score of 74

and a Full Scale score of 70 (Tr. at 171). Mr. Salinger characterized Plaintiff's level of

intellectual functioning as being in the "borderline range" (Tr. at 171). He interpreted Plaintiff's

scores as follows:

> The 12 point difference among scale scores is not significant, and indicates that
> overall language and visual-motor abilities are sufficient for marginal
> performance in occupational settings with demands for unskilled labor. While the
> 10 point difference between Verbal Comprehension and Perceptual Organization
> is not significant, it does suggest that Mr. Garrett has stronger perceptual-motor
> skills and non-verbal reasoning ability, and would probably do better in job
> settings demanding non-verbal problem solving. However, his deficient

performance on the Coding Subtest, which taps short-term visual memory and psychomotor speed (commonly needed mental skills for assembly line jobs) indicates the likelihood of his inability to work successfully in many kinds of factory jobs. On the other hand, his highest Subtest Score, at the 50th percentile, on Matrix Reasoning indicates a well developed ability to analyze, sort, and classify visual information (this kind of skill would be necessary, among others, for many types of warehouse tasks).

(Tr. at 171-172).

Plaintiff's functional academic skills, as measured by K-FAST, were nearly "low average" (Tr. at 172). He demonstrated a fairly well-developed ability to acquire and retain regularly-used basic information and to profit from practical experience (Tr. at 172).

Results from the MMPI-2 personality test indicated Plaintiff was admitting serious personal and psychological problems, was asking for help and appeared to be exaggerating the severity of his symptoms in order to obtain such help (Tr. at 172). Mr. Salinger noted:

He feels depressed, agitated, anxious, and guilty, and is fearful about what might happen to him while being fatalistic about his perceived inability to change circumstances for the better. Thus, he has difficulty initiating tasks or activities, has little hope of success if he does get started, and has lost his desire to work out problems. Mr. Garrett has difficulty with concentration, is forgetful, and believes his judgment has deteriorated. He thinks something is wrong with his mind, broods about having done something wrong or evil, and worries about things that are too bad to talk about. He believes that strangers look at him critically, others are only interested in themselves, and it is safer to trust nobody. Mr. Garrett is exceedingly introverted and withdrawn, makes others uneasy around him, and avoids social relationships. He has frank suicidal ideation and complains of inability to concentrate and sleep because of racing thoughts.

(Tr. at 172).

Mr. Salinger diagnosed Plaintiff with (1) Major Depressive Episode, severe without psychotic features, (2) Mild Mental Retardation (IQ of approximately 70 or below on an

individually administered IQ test) and (3) a Global Assessment of Functioning (GAF)[14] score equal to 50, reflecting serious symptoms (Tr. at 173).

Mr. Salinger noted that Plaintiff had performed at the "limits of his apparent capacity for several decades," but his "injuries, unemployment and deteriorating mental health seems to have exceeded his abilities and resources" (Tr. at 173). He recommended Plaintiff be referred to (1) a community mental health center, where appropriate treatment for three to six months should removed the mental health barrier to work, and (2) a vocational rehabilitation center if his physical complaints continue to be a barrier (Tr. at 173).

A psychiatric review technique form completed by Alan W. Aram, Psy.D., dated May 1, 2002, indicated Plaintiff's depressive syndrome was not severe, although there was evidence of sleep disturbance, psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness, and difficulty concentrating (Tr. at 157-169, 160). Plaintiff's activities of daily living were not limited; he did not have difficulty in maintaining social functioning (Tr. at 167). He did have mild difficulty in maintaining concentration, persistence and pace (Tr. at 167). Dr. Aram stated that Plaintiff's allegations of functional limitations were not supported by the medical evidence of record and, therefore, viewed as only partially credible (Tr. at 169). He further noted that although Plaintiff may have been credible at the time he described his limitations, he has since improved with medication (Tr. at 169).

On May 14, 2002, Plaintiff saw John Wy, M.D., for an internal medicine evaluation at the request of the Sinclair Department of Family Services (Tr. at 174-175). Plaintiff reported no

---

[14]A GAF score of 41-50 indicates serious symptoms or serious impairment in social, occupational or school functioning. American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders, 34 (4th ed., rev. vol. 2000).

Case 4:05-cv-00530-REL   Document 20   Filed 06/16/06   Page 16 of 47

energy and depression for many years (Tr. at 174). According to Plaintiff, the treatment he received for depression made him hallucinate so he stopped the treatment and his hallucinations improved (Tr. at 174). Plaintiff did not have any suicidal or homicidal intent (Tr. at 174). He described himself as constantly sad and hopeless, occasionally crying (Tr. at 174). Plaintiff also reported low back pain that radiated to the right buttock, leg and foot for more than ten years (Tr. at 174).

During his examination, Plaintiff was slow to answer questions, but ultimately answered questions appropriately most of the time (Tr. at 175). He stated was "accompanied by his brother because he forgets a lot of information." (Tr. at 175). Plaintiff was able to remove his shirt, socks and shoes without difficulty (Tr. at 175). He could hear normal conversation (Tr. at 175). Straight leg raises were negative and he had no spinal tenderness (Tr. at 175). Although Plaintiff's gait was normal, he did show some mild difficulty with toe and heel walking (Tr. at 175). Dr. Wy diagnosed Plaintiff with chronic low back pain, depression, and low intelligence quotient; he "highly recommended" a psychological evaluation (Tr. at 175). Dr. Wy also completed a certification form indicating Plaintiff's low back pain, depression, and low IQ would make it difficult for him to obtain permanent employment for the next four to six months (Tr. at 176-177).

Plaintiff was given a prescription for Flexeril 10 mg and Tenormin 50 mg on March 25, 2002 (Tr. at 187). On March 28, 2002, he stated his condition had improved (Tr. at 187). Plaintiff could get around much better and was now able to stand, sit and bend for short periods of time (Tr. at 187). The pain in his legs continued, but was not as sharp; he had numbness in his right inner leg (Tr. at 187). On occasion, Plaintiff's right hand would "go to sleep" (Tr. at 187).

17

Dr. Morton diagnosed Plaintiff as having back pain with spasms, gave him Celebrex 200 mg samples, and ordered a refill for Flexeril (Tr. at 187).

On June 20, 2002, Plaintiff reported that, three days prior, he had sharp left arm pain all day (Tr. at 187). Plaintiff denied chest pain, nausea, throat pain, shortness of breath or sweating (Tr. at 187). Dr. Morton ordered an EKG, and gave Plaintiff prescriptions for Celebrex 200 mg and Zanaflex 2mg (Tr. at 187).

On July 18, 2002, Plaintiff was seen for chronic low back pain, right elbow pain of one and one-half weeks duration, and an itching peeling rash on his feet (Tr. at 186). Plaintiff reported that he had missed several days of medication and assessed his pain as a five on a ten-point scale (Tr. at 186). Physical examination revealed tenderness in the lumbosacral spine to palpation, with some radiation from the left lateral thigh to the knee (Tr. at 186). Plaintiff was not experiencing any numbness or tingling in his legs (Tr. at 186). Straight leg raises were positive (Tr. at 186). The range of motion in Plaintiff's right elbow was normal (Tr. at 186). Dr. Morton prescribed Relafen[15] 500 mg, Flexeril 10 mg, Lotrisone cream,[16] and ordered a MRI of the lumbar spine (Tr. at 186). An MRI of the lumbar spine taken on July 22, 2002, and showed (1) mild disk degeneration at all lumbar disks with the exception of L4-5 and (2) mild generalized annular bulging at L5-S1 (Tr. at 195). There was no evidence of focal disk herniation or spinal stenosis (Tr. at 195).

---

[15]Relafen is a nonsteroidal, anti-inflammatory drug that "works by reducing hormones that cause inflammation and pain in the body." Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d00310a1;_ylt=An92ztVGexO3dbdAFNlQKFUkD7sF (last visited May 4, 2006).

[16]Lotrisone cream is a topical steroidal cream that prevents fungus from growing on the skin and reduces itching, swelling and redness. Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d03561a1;_ylt=AhtP7k0YZ34G1KKb0RVS2y8kD7sF (last visited May 4, 2006).

Case 4:05-cv-00530-REL   Document 20   Filed 06/16/06   Page 18 of 47

Plaintiff reported he was doing no lifting, squatting or bending on August 1, 2002, and complained of heartburn and occasional numbness in his right thumb (Tr. at 185). He did not have any pain in his legs (Tr. at 185). Dr. Morton diagnosed Plaintiff with chronic lumbar spine pain, hyperlipidemia, and as having a hiatal hernia (Tr. at 185). He gave Plaintiff a prescription for Zantac and recommended stretches and walking (Tr. at 185). On August 14, 2002, Plaintiff received a refill order for Tenormin 50 mg, Relafen 500 mg, an Flexeril 10 mg (Tr. at 185).

On September 3, 2002, Plaintiff reported his right elbow was sore and tender most of the time and his left thumb felt numb on the outside (Tr. at 185). He was diagnosed with tendinitis of the right elbow and prescribed Prednisone 5 mg, Sulindac[17] 150 mg, and Zantac 150 mg, and Mycolog cream[18] (Tr. at 185).

On September 18, 2002, Plaintiff's assessment included diverticulitis and chronic back pain (Tr. at 184). He was given a refill order for Tenormin 50 mg and Flexeril 10 mg (Tr. at 184).

Plaintiff reported rectal bleeding on both September 25, 2002, and September 26, 2002 (Tr. at 184). On September 23, 2002, Plaintiff underwent a colonoscopy and had a polyp removed (Tr. at 188, 199). He was diagnosed with diverticulitis (Tr. at 184).

Plaintiff was prescribed Zantac 50 mg on October 7, 2002 (Tr. at 183). On October 14, he was given a prescription for Tenormin 50mg (Tr. at 183).

On October 25, 2002, Plaintiff saw Dr. Morton for a follow-up appointment and reported

---

[17]Sulindac is a nonsteroidal, anti-inflammatory drug that "works by reducing hormones that cause inflammation and pain in the body." Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/ d00033a1;_ylt=Agwomtod5bhrkkt5tk3SS5QkD7sF (last visited May 4, 2006).

[18]Mycolog cream is a topical antifungal medication.

"feeling good" (Tr. at 183). He stated that the Sulindac worked best and was given a refill for that drug as well as for Flexeril (Tr. at 183). On November 22, 2002, Plaintiff received prescription refills for Flexeril 10 mg, Sulindac 150 mg, Tenormin 50 mg, and Zantac 150 mg (Tr. at183). He was given an additional thirty days of Tenormin 50 mg on December 16, 2002 (Tr. at 183).

Plaintiff continued to be seen at the Morton/VanZanten Clinic on a regular basis to follow-up on his diverticulitis and chronic back pain (Tr. at 180-83). On December 18, 2002, Plaintiff reported his back and legs ached (Tr. at 182). He was given refills for Sulindac and Flexeril, and advised to do back and leg stretches (Tr. at 182). On January 21, 2003, Plaintiff had a follow-up visit with Dr. Morton, at which he reported feeling "pretty good" (Tr. at 182). Assessment included hypertension and chronic back pain (Tr. at 182).

A medical report certifying disability was completed by Dr. Morton's nurse on February 27, 2003, which indicated Plaintiff had been treated during the period from February of 2002 through December of 2002 for chronic back pain, hypertension, and gastritis-diverticulitis (Tr. at 178). Plaintiff was reported to be unable to stand or walk without pain in the lumbar spine area for more than one-half to one block, had difficulty bending and stooping, and had pain after sitting for thirty minutes (Tr. at 179). Plaintiff was described as having a mental and/or physical disability that prevented him from engaging in substantial gainful activity for six to twelve months (Tr. at 179).

Plaintiff continued to refill his medications through Dr. Morton's office in 2003. On January 14, 2003, February 17, 2003, March 27, 2003, April 29, 2003, June 2, 2003, July 7, 2003, and August 6, 2003, Plaintiff's refills included Flexeril, Atenolol and Sulindac (Tr. at 180-

20

182, 211).  He was denied a prescription refill on September 4, 2003, until he saw the doctor again (Tr. at 211).

On March 6, 2003, Plaintiff advised Dr. Morton that he "ran out of steam" and did not have "much energy" (Tr. at 181).  He stated he had worked at Rival until it closed, and had not worked since (Tr. at 181).  Later in the visit, Plaintiff stated that it had actually been two years since he had worked, as he had not been working in an effort to obtain social security (Tr. at 181).  Dr. Morton encouraged Plaintiff to walk and exercise (Tr. at 181).  His wife noted he had done a lot of walking and fishing recently (Tr. at 181).  He reportedly caught a lot of fish over the winter (Tr. at 181).

Plaintiff had a second colonoscopy on March 10, 2003, to ensure there were no remaining polyps (Tr. at 198).  No sign of any residual from the polyp that had been removed was found (Tr. at 198).  No other significant abnormalities were noted (Tr. at 198).

During a September 8, 2003, office visit, Plaintiff reported his legs and back were still bothersome (Tr. at 210).  Dr. Morgan diagnosed him with sinusitis, hypertension, chronic back pain and an ingrown toenail (Tr. at 210).  Plaintiff received refill orders for Flexeril 10 mg, Tenormin 50 mg and Sulindac 150 mg (Tr. at 210).

Plaintiff began taking Lexapro[19] for his depression in September of 2003 (Tr. at 120).

On October 9, 2003, Plaintiff told Dr. Morton he had spasms in his right arm and that his knees were hurting badly (Tr. at 209).  Physical examination revealed tenderness and spasms in

---

[19]Lexapro is "used in the treatment of depression and generalized anxiety disorder."  It works by  affecting "chemicals in the brain that may become unbalanced and cause depression."  Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d04812a1/;_ylt=Amv.lXNncbxfKEMCDOEynylo3LMF (last visited May 5, 2006).

Case 4:05-cv-00530-REL   Document 20   Filed 06/16/06   Page 21 of 47

the right bicep muscle (Tr. at 209). He had a normal range of motion, and no tenderness with point palpation of muscle attachments (Tr. at 209). There was no warmth or swelling (Tr. at 209). Plaintiff was diagnosed with (1) hypertension, (2) chronic back pain, and (3) arthralgia (Tr. at 209). Dr. Morgan took Plaintiff off Flexeril and, instead, placed him on Methocarbarnol[20] 500 mg; he also ordered refills of Tenormin 50 mg, and Sulindac 150 mg (Tr. at 209).

A medical report certifying disability was completed by Dr. Morton on October 13, 2003, in which he noted Plaintiff had a long history of depression for which he recently started medication (Tr. at 202-203). He also had decreased circulation in his right foot and osteoarthritis[21] of his back (Tr. at 203). In the report, Dr. Morton documented Plaintiff's statement that he had quit his job at Rival to move to Osceola (Tr. at 202). He expected Plaintiff to remain disabled for an additional six to twelve months (Tr. at 203).

Dr. Morton also completed a Medical Source Statement of Ability to do Work-Related Activities (Physical) dated October 29, 2003 (Tr. at 204-207). It was Dr. Morton's opinion that Plaintiff could lift up to thirty pounds occasionally and twenty-five pounds frequently, stand at least two hours in an eight-hour day and sit approximately six hours (Tr. at 204-205). He noted that Plaintiff had chronic back pain and too much standing or walking could aggravate this condition (Tr. at 205). Plaintiff could frequently balance, but only occasionally climb, kneel,

---

[20]Methocarbarnal is a muscle relaxant that "works by blocking nerve impulses (or pain sensations) that are sent to [the] brain." Yahoo!Health, Drug Guide, *at* http://health.yahoo.com/drug/d00965a1;_ylt=AnYYfsq1mdirNj.W.VQ1KrUkD7sF (last visited May 5, 2006).

[21]"Arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result; mainly affects wight-bearing joints, is more common in older persons." STEDMAN'S MEDICAL DICTIONARY, at 1267.

crouch, crawl and stoop (Tr. at 205). He did not have any manipulative or visual/communicative limitations (Tr. at 206). Plaintiff needed to avoid hazards such as machinery and heights (Tr. at 207).

The record also contains a Medical Source Statement-Mental dated November 6, 2003, completed by Michael Salinger, M.A. (Tr. at 213-215). The statement only covers the one-day period of April 30, 2002 (Tr. at 215). Mr. Salinger noted Plaintiff had mental impairments lasting at least twelve continuous months (Tr. at 213). He found Plaintiff was not significantly limited in his ability to: (1) remember locations and work-like procedures; (2) understand and remember detailed instructions; (3) carry out detailed instructions; (4) sustain an ordinary routine without special supervisions; (5) make simple work-related decisions; and (6) travel in unfamiliar places or use public transportation (Tr. at 213-215).

Plaintiff was described as being moderately limited in his ability to: (1) maintain attention and concentration for extended periods; (2) perform activities within a schedule, maintain regular attendance and be punctual; (3) work in coordination with or in proximity to others without being distracted by them; (4) interact with the general public; (5) ask simple questions and to accept instructions; and (6) and respond appropriately to criticism from supervisors (Tr. at 214). He was deemed markedly limited in his ability to: (1) complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and lengths of rest periods; (2) respond appropriately to changes in the work setting; and (3) set realistic goals or make plans independently of others (Tr. at 214-215).

Finally, Mr. Salinger noted in the source statement that Plaintiff could understand,

remember and carry out simple instructions and make simple work-related decisions; he was unable to respond appropriately to supervision, co-workers, or usual work situations, and could not deal with changes in a routine work setting (Tr. at 215).

On March 10, 2004, Mr. Salinger conducted another comprehensive evaluation to clarify the status of Plaintiff's mental impairment (Plaintiff's Exh. B). According to the report, Plaintiff advised Mr. Salinger that his symptoms had worsened over the past two years (Plaintiff's Exh. C, at 1). The Color Trails Test[22] indicated the presence of a severe neurological impairment (Plaintiff's Exh. C, at 3). Plaintiff's IQ scores on the WAIS-III indicated he was "currently functioning in the extremely low (mildly mentally deficient) range of intellectual ability, with cognitive skills that exceed[ed] one percent of adults approximately his age taking th[e] test" (Plaintiff's Exh. C, at 3). His Performance IQ was significantly lower than it was in 2002, which "may be due to the effects of worsening depression, a deteriorative organic condition, or both" (Plaintiff's Exh. C, at 3).

K-FAST scores demonstrated Plaintiff's arithmetic skills were well below average and that his functional reading ability has deteriorated (Plaintiff's Exh. C, at 4). Psychopathology and personality functioning assessments revealed Plaintiff was

> generally apprehensive, believes that others look at him critically and thinks it is safer to trust no one. Mr. Garrett perceives himself to be confused and forgetful, attributes all of his problems to his recent injuries, and is exceedingly distressed about the physical and occupational collapse of his life. While he is basically dependant and ineffective, Mr. Garrett is irritable and resentful of his loss of control. He now recognizes his long-term habit of abusing his wife, but feels powerless to control his habit of blaming her for all of his problems. Mr. Garrett does not appear to grasp his cognitive deficiencies or apparent

---

[22]Mr. Salinger's report describes the Color Trails Test as being "a measure of sustained visual attention, visual scanning, visual sequencing, and perceptual-motor coordination that is sensitive to neuropsychological dysfunction" (Plaintiff's Exh. C, at 3).

cognitive decline.

(Plaintiff's Exh. C, at 6-7).

Mr. Salinger diagnosed Plaintiff with: (1) dementia, not otherwise specified (memory impairments, disturbance of executive function, significant impairment in functioning necessary for occupational success, significant decline from previous functioning); (2) major depressive disorder; (3) alcohol dependence, without psychological dependence, sustained in full remission; and (4) avoidant personality disorder (Plaintiff's Exh. C, at 7). Plaintiff's GAF was 31, meaning he had "major impairments with thinking, mood, family relations, and work" (Plaintiff's Exh. C, at 7).

Mr. Salinger noted Plaintiff's cognitive impairment and decline suggested a "deteriorative organic condition that should be further examined by a neurologist" (Plaintiff's Exh. C, at 8). He thought the likelihood of Plaintiff being able to "adaptively and independently function at home or on the job [was] considered extremely low" (Plaintiff's Exh. C, at 8).

### C. RESIDUAL PHYSICAL FUNCTIONAL CAPACITY ASSESSMENT

On April 29, 2002, Plaintiff underwent a physical residual functional capacity assessment and the following findings were made: Plaintiff could lift or carry up to twenty pounds occasionally and ten pounds frequently; he could stand or walk with normal breaks for a total of about six hours in an eight-hour workday; he could sit with normal breaks for a total of about six hours in an eight-hour workday; and his ability to push and pull was unlimited (Tr. at 100). These conclusions were based upon Plaintiff having degenerative disk disease with sciatica, an x-ray image showing narrowing at L5-S1, positive straight leg raises, decreased sensation, blood pressure of 130/90, and an absence of end organ damage (Tr. at 100).

In addition, it was found that Plaintiff was able to frequently balance (Tr. at 101). He could occasionally climb a ramp or stairs, stoop, kneel, crouch, and crawl, but could never climb a ladder, rope or scaffolds (Tr. at 101). Plaintiff did not have any manipulative, visual, communicative or environmental limitations (Tr. at 102-103). The non-physician counselor noted:

> Claimant alleges back and hip, high [blood pressure] and cholesterol problems. Claimant does not allege significant limitations from [blood pressure]/cholesterol problems. Claimant indicates limits from back, however his [activities of daily living] suggest that he continues to attend church, can go to the store shopping [with his] spouse, does some hobbies like hunting and fishing (although less than previously) is able to watch TV without difficulty if he's unable to sleep. Claimant does have some limitation and allegations determined to be partially credible.

(Tr. at 104).

### D.  SUMMARY OF TESTIMONY

During the hearing, Plaintiff and his wife testified; Michael Lala, a vocational expert, also testified at the request of the ALJ.

### 1.    Plaintiff's testimony

Plaintiff testified he was born April 27, 1950, and completed one-half of the 11th grade (Tr. at 233). He did not obtain a GED (Tr. at 233). He testified he had difficulty reading the newspaper and had a hard time understanding books (Tr. at 233). Plaintiff did not complete any of the disability application paperwork himself (Tr. at 233). Although Plaintiff testified he could write, he noted he "can't spell hardly a whole lot" (Tr. at 233). Plaintiff wears glasses, which he stated helped his vision "some" (Tr. at 234).

Plaintiff obtained his driver's license at age 18, after the licensing exam was read to him

Case 4:05-cv-00530-REL   Document 20   Filed 06/16/06   Page 26 of 47

(Tr. at 235). He normally drives himself when out running an errand or going to an appointment; however, his sister drove him to the hearing (Tr. at 234). Sometimes Plaintiff's medical condition causes him to forget where he is going when driving and he becomes sidetracked (Tr. at 235).

Plaintiff's employment history includes work as a car detailer and an assembly line worker. He worked as a car detailer at William Woody Nissan for nine years (Tr. at 236). There, Plaintiff washed and waxed cars; he also cleaned the cars' carpet and trunk (Tr. at 236-237). These tasks required him to be on his feet at all times, bending and reaching (Tr. at 237). He lifted five-gallon buckets of water and removed seats from cars, sometimes lifting up to fifty or seventy-five pounds (Tr. at 237). Plaintiff was let go from this job because he could not perform at the requisite level (Tr. at 237).

Plaintiff then started working at Rival, where he stayed for four years (Tr. at 236, 237). While working on the assembly line, Plaintiff both stood and sat, but probably spent more of the time standing (Tr. at 237-238). He had a difficult time working at a pace to keep up with the line (Tr. at 238). Due to this difficulty, Plaintiff became frustrated with the pressure (Tr. at 238). Plaintiff testified that he was also prevented from working due to his legs, back, feet and arms (Tr. at 238). He further testified that due to his inability to cope with other people, he became easily irritated and had trouble getting along with coworkers and supervisors (Tr. at 238-239). Following a fight with a supervisor, Plaintiff was warned he would be terminated if it happened again (Tr. at 239). His frustration continued, though, and he took his problems home, often taking out his frustration on his wife (Tr. at 239). Plaintiff ultimately quit this job (Tr. at 238).

Plaintiff alleges he became disabled in May of 2001 (Tr. at 235). However, he applied

for jobs shortly after this date because he was "just looking for another job" after leaving Rival (Tr. at 235-236).

Plaintiff testified he was depressed and spent a lot of time crying, stating "basically I think life sucks" (Tr. at 239). His condition affected his ability to sleep, as he was up and down at night thinking about things (Tr. at 239-240). The day after these sleepless nights he would feel terrible (Tr. at 240). He testified he had lost interest in things and had thought about killing himself (Tr. at 240). About once a week he cried out of frustration (Tr. at 240).

Plaintiff also has numerous physical problems. He testified to having pain in his lower back and between his shoulders (Tr. at 240). The pain was constant, varying from a four or five on a ten-point pain scale up to a ten (Tr. at 240-241). The severity of his pain depended on the weather and on Plaintiff's activities (Tr. at 241). Plaintiff also testified to having pain in his right arm and hands (Tr. at 241). While driving, Plaintiff's right arm and hand would go to sleep (Tr. at 241). He also testified that he had trouble gripping and picking up items, and dropped items such as plates and glasses approximately fifty percent of the time (Tr. at 241-242).

Plaintiff testified he had trouble breathing and that dust and fumes bothered him (Tr. at 242). Although he was supposed to take an allergy medicine, he could not afford to do so (Tr. at 242). Plaintiff also has difficulty hearing; when he tried to join the armed forces he failed the hearing test three times (Tr. at 242-243). The skin on Plaintiff's feet would blister, dry up and fall off (Tr. at 243). Three different doctors had told him there was nothing wrong with his feet (Tr. at 243). The pain in Plaintiff's feet radiates into his legs, and this pain in his legs and lower back prevent him from walking more than one block on level ground (Tr. at 243).

Plaintiff estimated he could only stand and sit for 30 minutes at a time because of his

back and legs (Tr. at 244). He could only lift ten pounds (Tr. at 244). During the day, Plaintiff

lies down for approximately four to five hours to help relieve fatigue and pain (Tr. at 244). He

testified that he would not make it through the day if he were unable to lie down as needed (Tr. at

244). Each of these restrictions had existed since May of 2001 (Tr. at 244-245).

A typical day for Plaintiff consisted of getting up around nine o'clock, having coffee and

taking his medications, walking around the yard and, then at 11:00 or 11:30 a.m., going back to

bed until suppertime (Tr. at 245). After eating supper he would watch television and then return

to bed (Tr. at 245). When watching television, Plaintiff could not really follow the plot and/or

story line of the programs (Tr. at 246). He did not perform any work around the house (Tr. at

246).

Plaintiff testified that other than a lack of sex drive, he did not suffer any adverse side

effects from his medication (Tr. at 236).

**2.      Patricia Garrett's testimony**

Plaintiff's wife of thirty-two years, Patricia Garrett, appeared at the hearing and testified

on Plaintiff's behalf (Tr. at 246-249). Mrs. Garrett testified that Plaintiff could read and write

very little (Tr. at 247). When he comes across a word he does not know, he asks her (Tr. at 247).

If she then asks him what he is reading about, Plaintiff responds that he does not know (Tr. at

247). Plaintiff also has trouble understanding and following directions (Tr. at 247). For

instance, if Mrs. Garrett sends him to the grocery store with a list, he does not return with the

items on the list (Tr. at 247).

Mrs. Garrett testified Plaintiff had problems with his job at Rival because he would fall

behind on his work (Tr. at 247). He also had problems getting along with others, and became

frustrated when his supervisors told him he was doing his job incorrectly and too slowly (Tr. at 247-248). After a day at work, Plaintiff would think about his frustrations and become more worked up (Tr. at 248).

Plaintiff had trouble getting along with others (Tr. at 248). If someone said something he did not like, he would either become angry or distant and withdrawn (Tr. at 248). Plaintiff was verbally abusive to Mrs. Garrett (Tr. at 248). She felt Plaintiff was depressed and noticed a big difference in his behavior (Tr. at 248). At times, he acted as though he were off by himself in his own mind (Tr. at 248-249). Plaintiff cried at least once a week over his life (Tr. at 249). He often complains and is bothered by his inability to pay for his medications (Tr. at 249).

Plaintiff does not do any work inside the home (Tr. at 249). In the summer months, he may try to mow but it takes "forever" (Tr. at 249).

### 3. Vocational expert testimony

Vocational expert Michael Lala testified at the request of the ALJ. Mr. Lala stated that Plaintiff's past relevant work was that of an automobile detailer, which is medium unskilled work (Tr. at 250). Plaintiff also has been previously employed as an assembler, which is classified as light, semiskilled work (Tr. at 250-251). The ALJ then asked whether Plaintiff could perform his past work within the following hypotheticals.

The ALJ first hypothesized that Plaintiff was 51 to 53 years of age, had a tenth grade education, and past work as described above (Tr. at 251). He had degenerative disk disease, major depression, obesity, a skin disorder affecting his feet that had been diagnosed as psoriasis, a diagnosis of mild mental retardation, and high blood pressure (Tr. at 251). Plaintiff could (1) lift up to thirty pounds, (2) carry twenty-five pounds frequently during the day, (3) stand and

30

walk no more than two hours, and (4) sit approximately six hours during the day (Tr. at 251). He would also need (1) to avoid climbing up or exposure to significant unprotected heights, potentially dangerous and/or unguarded moving machinery, and commercial driving due to the possibility of decreased mobility, and (2) even work surfaces on which to walk (Tr. at 251). Finally, Plaintiff would need work that included simple to detailed, but not complex, job instructions and should not work in customer service (Tr. at 251). Mr. Lala testified that such an individual would be able to perform the position of an assembler as it exists national economy (Tr. at 251, 252). Mr. Lala further testified that this position was classified as "light" because of the production requirements, not due to lifting requirements (Tr. at 251).

The ALJ next asked if Plaintiff could not perform his past work, whether any skills he obtained in past work would transfer to other work within the hypothetical (Tr. at 252). Mr. Lala testified that they would not (Tr. at 252).

Lastly, the ALJ asked Mr. Lala to assume she found Plaintiff's descriptions of limitations credible (Tr. at 252). Based on that assumption, the ALJ inquired whether there would be any competitive work available to Plaintiff if he were unable sustain eight hours of sitting, standing, and walking at any level, or up to two hours of concentration and attention (Tr. at 253). Mr. Lala responded that there would not (Tr. at 253).

### E. FINDINGS OF THE ALJ

On December 23, 2003, the ALJ issued an opinion finding that Plaintiff was not disabled at step four of the sequential analysis. The ALJ found at step one that Plaintiff had not worked since May 20, 2001, his alleged onset of disability (Tr. at 31). At step two, the ALJ found that Plaintiff had a number of severe impairments (Tr. at 31). However, she found at step three that

31

the impairments, "considered either singularly or in combination, have never met or equaled in severity the criteria of any impairment found in the Listing of Impairments at Appendix 1, Subpart P, Regulations Part 404" (Tr. at 31). At step four, the ALJ found Plaintiff's impairment did not prevent him from performing past relevant work (Tr. at 31).

## V. CREDIBILITY OF PLAINTIFF

Plaintiff contends that the ALJ erred in discrediting his statements regarding the severity of his symptoms and subjective complaints of pain.

### A. CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993); Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

In this case, I find that the ALJ's decision to discredit Plaintiff's subjective complaints are supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including a plaintiff's prior work

32

record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski, 739 at 1322.

The specific reasons for discrediting Plaintiff's subjective complaints are as follows:

### 1. PRIOR WORK RECORD

Plaintiff's work history shows he worked fairly consistently, but earned very little over his lifetime. His highest annual earnings occurred in 2000, when he made $15,554.71. Plaintiff did not earn wages in 1982, 1983, 1984 and 1896. His average annual earnings for the thirty-one years he did work is $5,730.11. Therefore, this factor does not support the ALJ's determination.

### 2. DAILY ACTIVITIES

In the Claimant Questionnaire, Plaintiff indicated that pain had caused him to become depressed because he could no longer do anything on his own (Tr. at 94). He stated that his wife puts on his socks and shoes and waits on him "a lot" (Tr. at 94). He reported only being able to put on his own pants using a bent hanger (Tr. at 95). Plaintiff told Dr. Morton on February 20, 2002, that he had difficulty standing, sitting, and getting up and down (Tr. at 148-149). However, medical records from February 27, 2002, reveal Plaintiff walked without difficulty (Tr. at 148). On March 19, 2002, Dr. Morton noted he walked without difficulty (Tr. at 147). Again on April 20, 2002, Dr. Ash observed Plaintiff to move satisfactorily, without a limp or a list, and noted he did not have any difficulty in rising from the exam table or chair or in dressing and undressing (Tr. at 153). Plaintiff's gait, both with and without assistive devices, was fine (Tr. at 156). Dr. Wy noted that Plaintiff's gait was normal and he was able to remove his shirt, socks and shoes

33

without difficulty on May 14, 2002 (Tr. at 175).

Plaintiff also stated in the Claimant Questionnaire that he could do little shopping because he is unable to see the prices on the various items and cannot afford to go to the eye doctor. He said he has a similarly difficult time using the telephone due to his inability to see the numbers (Tr. at 95). However, Plaintiff's vision is 20/30 in his left eye and 20/40 in his right eye (Tr. at 156). He testified at the hearing that he wears glasses (Tr. at 234).

Plaintiff also noted that his inability to walk as needed prevented him from going hunting and fishing and from playing sports as often as he would like (Tr. at 95-96). This is inconsistent with his wife's March 6, 2003, statement to Dr. Morton that Plaintiff had done a lot of walking and fishing recently, and that he had caught a lot of fish over the winter (Tr. at 181).

Plaintiff testified at the hearing that he had trouble gripping and picking up items, and estimated that he dropped items such as plates and glasses approximately fifty percent of the time (Tr. at 241-242). On April 26, 2002, however, Dr. Ash found that Plaintiff did not exhibit any weakness, deformity or atrophy, and that grip and pinch strength were strong in both hands (Tr. at 154).

The inconsistencies in evidence concerning the limitations pain imposed on Plaintiff's activities of daily living are wide-ranging and numerous. As a result, this factor supports the ALJ's credibility determination.

### 3. DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

The instant appeal deals with the ALJ's denial of benefits only for the period spanning from May 20, 2001, through December 23, 2003. Plaintiff's medical records do not contain any documented complaints of back pain until February 20, 2002 (Tr. at 149), although he was seen

by doctors before that date. Results from the MMPI-2 personality test indicated Plaintiff appeared to be exaggerating the severity of his symptoms in order to obtain help (Tr. at 172). This factor supports the ALJ's determination.

### 4. PRECIPITATING AND AGGRAVATING FACTORS

On February 20, 2002, Plaintiff told Dr. Morton that he had suffered from chronic back trouble for the past fifteen years due to a fall in the bathtub (Tr. at 149). He told Mr. Salinger on April 30, 2002, that this injury occurred eight years ago (Tr. at 171). On May 24, 2002, he told Dr. Wy he had struggled with chronic back pain for ten years (Tr. at 174). As a result, I find this factor supports a finding that Plaintiff's complaints were not credible.

### 5. DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION

In the Claimant Questionnaire, Plaintiff stated that, although he had received treatment for his depression, the medication "seemed to make it worse so I stay depress [sic] a lot" (Tr. at 94). However, he told Dr. Badger on April 17, 2001, that the Celexa helped him sleep and lessened his depression (Tr. at 122). Plaintiff further stated that he was happy with the results and wanted to continue the drug (Tr. at 122). Again on September 18, 2001, Plaintiff reported the Celexa was helping. Review of the medical evidence of record reveals that Plaintiff took Celexa from January 6, 2001, through at least April of 2002, without any documented complaints. On May 14, 2002, Plaintiff told Dr. Wy that the treatment he received for depression made him hallucinate so he stopped the treatment and his hallucinations improved. He began taking Lexapro in September of 2003 (Tr. at 120). There is no indication that this drug was ineffective.

Self-reported side effects of his medications included a loss of sex drive and difficulty

Case 4:05-cv-00530-REL    Document 20    Filed 06/16/06    Page 35 of 47

sleeping (Tr. at 94, 95). Plaintiff's medical records do not document any complaints regarding difficulty sleeping. He testified at the hearing that, other than a lack of sex drive, he did not suffer any adverse side effects from his medication (Tr. at 236). This factor supports the ALJ's credibility determination.

## B. CREDIBILITY CONCLUSION

The record also contains inconsistent statements concerning why Plaintiff stopped working at Rival and the date on which Plaintiff could no longer continue working. That is, Plaintiff testified at the hearing that he quit working at Rival due to frustration resulting from not being able to work fast enough and from his inability to get along with coworkers and supervisors (Tr. at 238-239). He told Dr. Morton and Mr. Salinger, however, he quit so that he could move to Osceola, Missouri (Tr. at 171, 181, 202). Plaintiff also claims that he became disabled on and could no longer work after May 20, 2001, although the record indicates he continued to apply for jobs after this date (Tr. at 171, 235-236). He told Dr. Morton he had not been working in an effort to obtain social security (Tr. at 181).

For this reason, and those discussed more fully above, I find that the record contains substantial evidence supporting the ALJ's findings that Plaintiff's subjective complaints of pain were not credible. Plaintiff's motion for summary judgment on this basis is, therefore, denied.

## VI. MENTAL IMPAIRMENT LISTINGS

Plaintiff argues that the ALJ erred in finding he did not have an impairment that met or equaled the requirements of Listing 12.02, 12.04 and/or 12.05. The evidence of record will be evaluated according to each listing below.

**A. Listing 12.02 - Organic Mental Disorders**

Listing 12.02 deals with "psychological or behavioral abnormalities associated with a dysfunction of the brain." 20 C.F.R. § 404, app 1. History and physical examination or laboratory tests must "demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities." Id. If this initial burden is met, the claimant must then satisfy an additional set of criterion. Id.

In this case, Plaintiff argues that the evidence obtained from Mr. Salinger's March 10, 2004, evaluation (Plaintiff's Exh. C) supports a finding that he has a organic mental disorder. The report states that Plaintiff's cognitive impairment and decline suggested a "deteriorative organic condition that should be further examined by a neurologist" (Plaintiff's Exh. C, at 8). While this statement is far from being determinative of whether Plaintiff does, indeed, have an organic disorder, it was rendered at a point in time outside the instant inquiry. Specifically, this appeal from the Commissioner's decision covers only the limited period from May 20, 2001, through December 23, 2003; Mr. Salinger evaluated Plaintiff approximately two and a half months later. The report is, therefore, not probative of Plaintiff's condition during the relevant time period. See Rehder v. Apfel, 205 F.3d 1056, 1061 (8th Cir. 2000).

Absent Mr. Salinger's March 10, 2004, evaluation, the record is completely devoid of evidence that would support a finding that Plaintiff's impairment(s) meet Listing 12.02. Plaintiff has never been diagnosed with an organic disorder. He has never been referred to a neurologist and diagnostic tests and/or imaging have not been performed or even requested. As a result, the ALJ did not err in finding that Plaintiff did not meet the requirements of Listing 12.02.

37

## B. Listing 12.04 - Affective Disorders

Plaintiff next contends that his impairments meet or equal the requirements set forth in

Listing 12.04B.  He argues that the November 6, 2003, Medical Source Statement completed by

Mr. Salinger reflects he is "markedly limited in the ability to complete a normal workday and

perform at a consistent pace corresponding to the requirements of 12.04B.3, and is markedly

limited in ability to respond appropriately to changes in the work setting and in his ability to set

realistic goals or make plans independently of others, corresponding to 12.04B.2" (Plaintiff's

Brief, at 31).

Listing 12.04 pertains to mental impairments "[c]haracterized by a disturbance of mood,

accompanied by a full or partial manic or depressive syndrome."  Id.  The requisite level of

severity is met "when the requirements in both A and B are satisfied, or when the requirements in

C are satisfied":

> A.      Medically documented persistence, either continuous or intermittent, of
> one or more of the following:
>> 1.      Depressive syndrome characterized by at least four of the
>> following:
>>> a.      Anhedonia or pervasive loss of interest in almost all
>>> activities;
>>> b.      Appetite disturbance with change in weight; or
>>> c.      Sleep disturbance; or
>>> d.      Psychomotor agitation or retardation; or
>>> e.      Decreased energy; or
>>> f.      Feelings of guilt or worthlessness; or
>>> g.      Difficulty concentrating or thinking; or
>>> h.      Thoughts of suicide; or
>>> i.      Hallucinations, delusions, or paranoid thinking;
>
>                          .    .    .
>
> AND
> B.      Resulting in at least two of the following:

38

> 1.      Marked restriction of activities of daily living; or
> 2.      Marked difficulties in maintaining social functioning; or
> 3.      Marked difficulties in maintaining concentration, persistence, or pace; or
> 4.      Repeated episodes of decompensation, each of extended duration;

OR

C.      Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

> 1.      Repeated episodes of decompensation, each of extended duration; or
> 2.      A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
> 3.      Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Id.

In this case, the ALJ correctly determined that Plaintiff exhibited at least four of the characteristics listed in subsection A. A review of the record reveals documented complaints of: (1) loss of interest (Tr. at 94), satisfying A(1)(a); (2) sleep disturbance (Tr. at 95, 122, 160, 172), satisfying A(1)(c); (3) psychomotor agitation or retardation (Tr. at 160), satisfying A(1)(d); (4) decreased energy (Tr. at 160), satisfying A(1)(e); (5) feelings of guilt or worthlessness (Tr. at 160, 172), satisfying A(1)(f); (6) difficulty concentrating (Tr. at 160, 170, 172; Plaintiff's Exh. A), satisfying A(1)(g); and (7) thoughts of suicide (Tr. at 172), thus satisfying A(1)(h).

The record does not, however, demonstrate Plaintiff's condition resulted in at least two of the characteristics listed in subsection B. Despite having been diagnosed with depression by Drs. Badger (Tr. at 122), Morton (Tr. at 150), Aram (Tr. at 157), Wy (Tr. at 175), none of these doctors ever found Plaintiff to be "markedly limited" by his depression as required by Listing

39

12.04B. To the contrary, Dr. Aram specifically stated that Plaintiff's activities of daily living were not limited, that he did not have difficulty maintaining social functioning, and that he only had mild difficulty maintaining concentration, persistence and pace (Tr. at 167). He further stated that Plaintiff's allegations of functional limitations were not supported by the medical evidence and, therefore, viewed as only partially credible, and that Plaintiff's limitations had improved with medication (Tr. at 169).

Plaintiff maintains that Mr. Salinger's Medical Source Statement - Mental, dated November 6, 2003, constitutes the requisite evidence. In the Medical Source Statement, Mr. Salinger found Plaintiff to be markedly limited in his ability to: (1) complete a normal workday and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (2) respond appropriately to changes in the work setting; and (3) set realistic goals or make plans independently of others (Tr. at 214-215). Mr. Salinger's statement was based solely upon his April 30, 2002, evaluation of Plaintiff; he did not see Plaintiff again between the date of his evaluation and the date on which he completed the Mental Medical Source Statement, nearly eighteen months later.

In evaluating the medical evidence of record, the ALJ afforded little weight to Mr. Salinger's November 6, 2003, Medical Source Statement due to the inconsistencies in assessments in his April of 2002 and November of 2003 reports (Tr. at 21). That is, in April of 2002, Mr. Salinger opined that, after three to six months of treatment, Plaintiff's depression would not prevent him from working (Tr. at 173). He also stated that Plaintiff appeared to be exaggerating the severity of his symptoms in order to obtain help (Tr. at 172). In November of

2003, Mr. Salinger assessed Plaintiff as having marked limitations; he did not address Plaintiff's symptom exaggeration (Tr. at 213-215). For these reasons, the ALJ did not err in giving less weight to Mr. Salinger's November 6, 2003, Medical Source Statement.

The ALJ's decision to afford little weight to Mr. Salinger's 2003 report is further bolstered by the fact that the results of other evaluations performed on Plaintiff very near in time to the evaluation conducted by Mr. Salinger did not reveal such a heightened level of limitation. On April 26, 2002, Plaintiff was evaluated by Dr. Ash (Tr. at 153-156). Dr. Ash assessed Plaintiff as having moderately poor insight, severe poverty of thought content, and as being mildly below normal (Plaintiff's Exh. A). He diagnosed Plaintiff with anxiety, but did not document any limitations (Plaintiff's Exh. A). Similarly, Plaintiff was evaluated by Dr. Aram on May 1, 2002 (Tr. at 157-169). Dr. Aram diagnosed Plaintiff with non-severe depression (Tr. at 160).[23] He further stated Plaintiff's allegations of limitation were not supported by the medical evidence and opined Plaintiff's activities of daily living were not limited, that he did not have difficulty in maintaining social functioning, and had only mild difficulty maintaining concentration, persistence and pace (Tr. at 167). On May 14, 2002, Dr. Wy diagnosed Plaintiff as having depression and recommended he undergo a psychological evaluation (Tr. at 175). No formal limitations were noted. I, therefore, find that the record contains substantial evidence to support the ALJ's decision that Plaintiff did not meet the requirements of Listing 12.04.

---

[23]Dr. Aram stated that Plaintiff's depression was not severe with medication (Tr. at 177). I note that the medical evidence of record indicates Plaintiff's depression was successfully managed with medication. Plaintiff was prescribed 20 mg of Celexa on January 6, 2001, and his records show that, for over two and a half years, doctors neither prescribed a different antidepressant nor modified the dosage of Celexa prescribed with hopes of obtaining better results. Moreover, Plaintiff's own statements demonstrate Celexa was working and that he was satisfied with the results (Tr. at 122, 149). Aside from undergoing psychological evaluations, Plaintiff's medical records do not show that he sought treatment for or presented with complaints of depression after his initial January 6, 2001, appointment with Dr. Badger until he was prescribed Lexapro in September of 2003.

41

## C. Listing 12.05 - Mental Retardation

Listing 12.05 refers to "mental retardation" as "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; (*i.e.*, the evidence demonstrates or supports onset of the impairment before age 22)." Id. The requisite level of severity is met under this listing when A, B, C or D are satisfied:

>    A.    Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions such that the use of standardized measures of intellectual functioning is precluded;
>    OR
>    B.    A valid verbal, performance, or full scale IQ of 59 or less;
>    OR
>    C.    A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;
>    OR
>    D.    A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
>        1.    Marked restriction of activities of daily living; or
>        2.    Marked difficulties in maintaining social functioning; or
>        3.    Marked difficulties in maintaining concentration, persistence, or pace; or
>        4.    Repeated episodes of decompensation, each of extended duration.

Id.

In this case, Plaintiff argues that the ALJ erred in finding that he did not meet or equal the requirements of Listing 12.05C. The Commissioner maintains that, based on the Diagnostic and Statistical Manual of Mental Disorders' definition of "mental retardation,"[24] the record does not

---

[24]The Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") provides that the diagnosis of mental retardation requires both subaverage general intellectual functioning and deficits in adaptive functioning. DSM-IV at 42. According to the DSM-IV, adaptive functioning refers to how effectively individuals cope with "common life demands" and how well they meet the standards of personal independence expected of one in their particular age group,

contain substantial evidence that Plaintiff lacked had both subaverage general intellectual

function and deficits in adaptive functioning.  In Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir.

2006), the Eighth Circuit rejected the Commissioner's position, stating that in order to be entitled

to benefits under Listing 12.05C, a claimant need not prove that he or she is mentally retarded

according to the DSM's definition.  Id. ("In revising the Listings of Impairments in 2002, the

Commissioner rejected a proposal that the DSM's definition be used for Listing 12.05.")(citing

Technical Revisions to Medical Criteria for Determinations of Disability, 67 Fed. Reg. 20,022

(Apr. 24, 2002)).  Instead, a he or she must only show "(1) a valid verbal, performance, or full

scale IQ of 60 through 70; (2) an onset of the impairment before age 22; and (3) a physical or

other mental impairment imposing an additional and significant work-related limitation of

function."  Maresh v. Barnhart, 438 F.3d at 899.  Because the record contains substantial

evidence that Plaintiff cannot satisfy the first requirement, the final two will not be discussed.

Plaintiff cannot prove that he has a valid IQ score of 60 through 70.  Plaintiff has a full

scale IQ of approximately 70, as measured by the WAIS III (Tr. at 171, 173); however,

substantial evidence exists that this score is not valid.  Information other than the IQ score that

"indicates an individual's ability to function can be used to discredit the results" of the test.

Johnson v. Barnhart, 390 F.3d 1067, 1071 (8th Cir. 2004); see also Clay v. Barnhart, 417 F.3d

922, 929 (8th Cir. 2005); Holland v. Apfel, 153 F.3d 620, 621-22 (8th Cir. 1998)("An IQ test is

useful in determining whether an applicant has a mental impairment, but other information in the

---

sociocultural background, and community setting.  Id.  There are ten adaptive skills areas: communication; self-care;
home living; social/interpersonal skills; use of community resources; self-direction; functional academic skills; work;
leisure; health; and safety.  Id.  A diagnosis of mental retardation requires "significant limitations" in at least two of these
areas.  Id.

Case 4:05-cv-00530-REL   Document 20   Filed 06/16/06   Page 43 of 47

record which indicates the individual's ability to function can be used to discredit the lone IQ score."); Mackey v. Shalala, 47 F.3d 951, 953 (8th Cir. 1995). Here, Plaintiff's MMPI-2 results indicated he was exaggerating symptom severity in order to get help (Tr. at 172). See Clay, 417 F.3d at 930-31(malingering and consciously exaggerating symptoms resulted in ALJ finding claimant's IQ scores invalid); Johnson, 390 F.3d at 1071 (malingering and randomly answering items on the MMPI-2 were basis for rejecting IQ scores). This information calls into question the validity of Plaintiff's full scale IQ score of 70.

Additionally, as noted by the ALJ, the record contains substantial evidence that Plaintiff's work history does not support a finding of disability under Listing 12.05C. Plaintiff worked for nearly thirty years at this mental capacity, as the record does not reflect any condition and/or event that would suggest a recent decline in Plaintiff's level of intellectual functioning. See Maresh, 438 F.3d at 900 (quoting Muncy v. Apfel, 247 F.3d 728, 734 (8th Cir. 2001))("[A] person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning.").

Throughout this period of time, Plaintiff never worked in an sheltered environment. Although Plaintiff testified that he quit his job at Rival due to frustration and inability to get along with his coworkers and supervisors (Tr. 238-239), the record contains contrary evidence that he quit in order to move to Osceola (Tr. at 171, 202) and that he worked at Rival until it closed (Tr. at 181). Plaintiff also made statements that suggest that his decision not to work was not necessitated by his impairments. He reported to Mr. Salinger and testified at the hearing that he applied for jobs since leaving Rival, and after the date on which he alleges he became disabled, but was never ultimately hired (Tr. at 171, 235-236). He told Dr. Morgan he had not

44

worked in two years in an effort to obtain social security (Tr. at 181). Plaintiff's work history, therefore, serves as an additional basis for finding that his IQ of 70, alone, was not sufficient to find him disabled.

In furtherance of his position that the results of his IQ test are valid, Plaintiff points to evidence in the record that he was in special education classes until the 11th grade when he dropped out, was given passing grades just for "being there," is barely able to read and write despite more than ten years of education, and that he had to be read his driver's license examination (Plaintiff's Brief, at 33). Even though this evidence might support a finding that Plaintiff's IQ scores are valid, as discussed above, the record as a whole also contains substantial evidence that they are not. "If, after review, we find it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, we must affirm the decision of the Commissioner." Nguyen v. Chater, 75 F.3d 429, 431 (8th Cir. 1996). I, therefore, affirm the Commissioner's decision on this basis.

### VII. VOCATIONAL EXPERT'S TESTIMONY

Plaintiff argues that the ALJ improperly relied on the testimony of the Mr. Lala, since the hypothetical she posed to him did not include all of Plaintiff's impairments. He specifically claims that the ALJ's hypothetical should have included limitations of his (1) inability to concentrate, (2) problems with short-term memory and (3) deficient psychomotor speed.

In her opinion, the ALJ found that Plaintiff's mental impairments, when treated with appropriate medication, resulted in "moderate deficiencies in his concentration, persistence, or pace, and the ability to complete tasks in a timely manner in work settings or elsewhere" (Tr. at 24). The hypothetical posed to Mr. Lala restricted Plaintiff to performing work that included

simple to detailed, but not complex, job instructions and no customer service (Tr. at 251). This question contemplates Plaintiff's deficiencies in concentration by limiting both (1) the complexity of instructions he would be require to follow and (2) his interaction with others, thereby adequately accounting for the limitations caused by his mental impairments.

Plaintiff is correct that the ALJ did not pose restrictions based on Plaintiff's short-term memory and psychomotor speed deficiencies. He bases his argument that the ALJ's hypothetical should have reflected such limitations on Mr. Salinger's April 30, 2002, report that states "[Plaintiff's] deficient performance on the Coding Subtest, which taps short-term visual memory and psychomotor speed (commonly needed mental skills for assembly line jobs) indicates the likelihood of his inability to work successfully in many kinds of factory jobs" (Tr. at 171-172). Notably, only Mr. Salinger's report contains these alleged deficiencies; the ALJ did not find Plaintiff to be so limited. Hypotheticals to a vocational expert need not take into consideration all evidence contained in the record, but only those impairments the ALJ finds to be medically determinable and severe. House v. Shalala, 34 F.3d 691, 694 (8th Cir. 1994)(quoting Roberts v. Heckler, 783 F.2d 110, 112 (8th Cir. 1985))("[A] proper hypothetical question 'is sufficient if it sets forth the impairments which are accepted as true by the ALJ.'"). As a result, the ALJ did not err in relying on the testimony of Mr. Lala indicating Plaintiff could return to his past relevant work as an assembler.

### VIII. CONCLUSIONS

Therefore, it is

ORDERED that Plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

Case 4:05-cv-00530-REL   Document 20   Filed 06/16/06   Page 46 of 47

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
June 15, 2006

47